PAUL J. STEINER, ESQ. [SBN 41117]
LAW OFFICES OF PAUL J. STEINER
580 California Street, 12th Floor
San Francisco, Ca 94104
Telephone: (415) 981-6100
Facsimile: (415) 984-0950
Email: paul@sfpaulaw.com

FRANK F. SOMMERS, IV [SBN 109012]
SOMMERS LAW P.C.
227 Princeton Avenue
Mill Valley, CA 94941
Telephone: (415) 308-4004
Email: ffs@sommerslawpc.com

Attorneys for Plaintiff ESC-TOY Ltd.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESC-TOY LTD., a Nevada Corporation, | **Case No.:** |
| Plaintiff, | **PLAINTIFF ESC-TOY LTD.'S COMPLAINT FOR NEGLIGENT MISREPRESENTATION AND FRAUD** |
| v. | |
| INSOMNIAC GAMES, INC., a California Corporation, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

1

**COMPLAINT FOR NEGLIGENT MISREPRESENTATION AND FRAUD**

ESC-TOY Ltd. ("ESC") complaints and alleges as follows against defendant Insomniac Games, Inc. ("Insomniac"). The allegations herein are based on ESC's personal knowledge with respect to its own actions and upon information and belief as to all other matters.

## THE PARTIES

1.     ESC is a Nevada corporation having a principal place of business at 6625 South Valley View Boulevard, Suite 326, Las Vegas, Nevada 89118. ESC is a premier, aware-winning brand management and development company, provider, and distributor of collectible merchandising works in the gaming and entertainment industries.

2.     Insomniac is a California corporation having its principal place of business at 2255 North Ontario Street, Suite 550, Burbank, California 91504. Insomniac, a subsidiary of Sony Interactive Entertainment LLCs ("SIE"), develops video games, including several PlayStation video games.

## JURISDICTION AND VENUE

3.     This is a civil action for Insomniac's breach of written contracts.

4.     This Court has original jurisdiction over the subject matter of this action under at least 28 U.S.D. §1332(a). ESC resides in Nevada and Insomniac resides in California. The matter in controversy far exceeds $75,000, exclusive of interest and costs, described herein.

5.     This Court has personal jurisdiction over Insomniac because Insomniac engaged in acts of wrongful conduct, described herein, in this judicial district.

6.     Venue is proper in this judicial district because Insomniac performed tortious and wrongful acts in this district and is subject to personal jurisdiction in this district.

/ / /

/ / /

COMPLAINT FOR NEGLIGENT MISREPRESENTATION AND FRAUD

## FACTUAL BACKGROUND

### A.    ESC'S business

7.    ESC was founded in 2005 by award-winning artist Erick Chatel (also known as Erick Scarecrow) ("Scarecrow"). ESC designs, creates, and manufactures collectible merchandise in the gaming and entertainment industries, including electronic characters, figures, avatars, as well as physical items such as toys, figures, apparel, lifestyle items, tabletop games, digital games, and collector pins.

8.    ESC offers a range of services related to the creation of collectible merchandise, including concept development, brand development, brand management, design, production, marketing, and fulfillment services.

9.    ESC has garnered a positive reputation for its collective work on private label development for several brands and has become known for its consistent high-quality merchandise. This has resulted in highly sought-after exclusive figures and collectibles of several video game characters. ESC quickly grew from a small start-up to a successful and well-recognized business partner to its clients in the video game and entertainment industries.

10.    ESC's success was further built upon Scarecrow's artistic ability and entrepreneurial spirit. ESC's design work has earned Scarecrow and ESC over 20 industry awards, including "Artist of the Year" and awards for its merchandise lines. To date, ESC has over 1,000 releases, many of which have been sold worldwide. ESC's work has been featured in major motion pictures, triple-A video game releases, TV shows, and a documentary.

11.    Approximately 95% of ESC's business arises from the video game industry, including business with triple-A brands and companies such as Activision/Blizzard, Universal, PlayStation, 505 Games, CoolMiniorNot, Devolver Digital, Guerilla Games, Insomniac Games, Klei Entertainment, Limited Brands, Metro-Goldwyn-Mayer MEDIA Co., Naughty Dog, SCE Japan Studio, and SIE.

**COMPLAINT FOR NEGLIGENT MISREPRESENTATION AND FRAUD**

Triple-A brands and companies are the large video game developers and major publishers that create and produce video games for publishers' video game platforms.

B. ESC's business relationship with Insomniac

12. ESC developed a business relationship with Insomniac in 2017. At the commencement of that relationship, Insomniac was an independent video game developer that collaborated with SIE to develop and publish PlayStation video games. Insomniac has developed several triple-A video games, including Ratchet & Clank, Spyro, and the PlayStation 4 exclusive video game Marvel Spider-Man.

13. On May 1, 2018, ESC entered into a "Fulfillment Agreement" and a "Product Procurement Agreement" (collectively, "Agreements") with Insomniac.

14. During the term of the Agreements, Insomniac was acquired by SIE, becoming a wholly owned subsidiary of SIE for a reported $229 million.

C. The Product Procurement Agreement

15. Insomniac breached the Product Procurement Agreement with ESC, as further alleged below, causing ESC substantial damage to ESC.

D. Fulfillment Agreement

16. Insomniac breached the Fulfillment Agreement with ESC, as further alleged below, causing ESC substantial damages to ESC.

E. Breaches of the Agreements

(i) Marvel Spider-Man merchandise for the Insomniac Online Store.

17. At the time ESC entered into the Product Procurement Agreement with Insomniac, the title of Spider-Man PS4 was unknown. Spider-Man PS4 later became publicly known as Marvel Spider-Man. Marvel Spider-Man's distinguishing feature is the Advanced Suit that Insomniac created exclusively for the game. The most prominent aspect of the Advanced Suit that distinguishes it

**COMPLAINT FOR NEGLIGENT MISREPRESENTATION AND FRAUD**

from other Spider-Man suits is the large spider with long legs on the chest of the suit.

18.    (iv)    Failure to approve designs and interference with right to produce

(a)    Marvel Spider-Man

19.    Insomniac breached the Product Procurement Agreement and Fulfillment Agreement by interfering with ESC's production of all Marvel Spider-Man merchandise, inhibiting ESC's ability to realize any economic benefits from its agreements could approve ESC's production of Marvel Spider-Man merchandise. ESC reached out to Insomniac for updates on the approval process of its production of Marvel Spider-Man merchandise multiple times. Despite repeatedly promising to reach out to Marvel, Insomniac failed to provide ESC with any further updates or responses.

20.    Eventually, Insomniac intentionally stopped responding to ESC's multiple follow-up emails and requests for communication. This inhibited ESC's ability to produce and fulfill all of the Marvel Spider-Man merchandise it was entitled to produce and fulfill under the Product Procurement Agreement and Fulfillment Agreement.

21.    Insomniac to consult about product details in order to approve proposed merchandise,

Insomniac feigned that it would take a more "proactive" role, which was immediately

followed by silence and ignoring ESC's requests.

(b)    Spyro

Insomniac breached the Product Procurement Agreement and Fulfillment Agreement by interfering with ESC's production of all Spyro merchandise, inhibiting ESC's ability to realize any economic benefits from its agreements with Insomniac.

**COMPLAINT FOR NEGLIGENT MISREPRESENTATION AND FRAUD**

22.    ESC reached out to Insomniac for updates on the approval process of its production of Spyro merchandise multiple times. Despite repeatedly promising to reach out to Activision, Insomniac failed to provide ESC with any further updates or responses.

23.    Eventually, Insomniac intentionally stopped responding to ESC's multiple follow-up emails and requests for communication. This inhibited ESC's ability to produce and fulfill all of the Spyro merchandise it was entitled to produce and fulfill under the Product Procurement Agreement and Fulfillment Agreement.

24.    When ESC reached out to Insomniac to consult about product details in order to approve proposed merchandise, Insomniac feigned that it would take a more "proactive" role, which was immediately followed by silence and ignoring ESC's requests.

(c)    Ratchet & Clank

25.    Additionally, ESC sent Insomniac multiple designs and concepts for the Ratchet & Clank merchandise. Insomniac intentionally stopped responding to ESC's multiple follow-up emails and requests for communication. This inhibited ESC's ability to produce and fulfill the remainder of the Ratchet & Clank merchandise it was entitled to produce and fulfill under the Product Procurement Agreement and Fulfillment Agreement.

26.    Insomniac to consult about product details in order to approve proposed merchandise, Insomniac feigned that it would take a more "proactive" role, which was immediately followed by silence and ignoring ESC's requests. For example, ESC is experienced with providing digital game content for video game developers sold along with exclusive ESC merchandise. Due to ESC's digital game experience, however, when ESC reached out to Insomniac to consult about merchandise, Insomniac feigned that it would take a more "proactive" role.

(d)    Sunset Overdrive

**COMPLAINT FOR NEGLIGENT MISREPRESENTATION AND FRAUD**

27.    ESC sent Insomniac multiple designs and concepts for the Sunset Overdrive merchandise. Insomniac intentionally stopped responding to ESC's multiple follow-up emails and requests for communication. This inhibited ESC's ability to produce and fulfill the remainder of the Sunset Overdrive merchandise it was entitled to produce and fulfill under the Product Procurement Agreement and Fulfillment Agreement.

28.    Insomniac breached the Agreements by repeatedly delaying and ultimately failing to respond to ESC's requests and unreasonably withholding acceptance by not giving a response at all.

(e)    Insomniac

29.    ESC sent Insomniac multiple designs and concepts for the Insomniac merchandise. Insomniac intentionally stopped responding to ESC's multiple follow-up emails and requests for communication. This inhibited ESC's ability to produce and fulfill the remainder of the Insomniac merchandise it was entitled to produce and fulfill under the Product Procurement Agreement and Fulfillment Agreement.

30.    Insomniac breached the Agreements by repeatedly delaying and ultimately failing to respond to ESC's requests and unreasonably withholding acceptance by not giving a response at all.

## FIRST CLAIM FOR RELIEF

### Negligent Misrepresentation

31.    ESC repeats and alleges each and every allegation above as if fully set forth herein.

32.    Insomniac granted ESC the Sunset Overdrive graphic tees and Ratchet & Clank graphic tees, which ESC actually produced.

33.    Insomniac represented to ESC that it owned all the necessary intellectual property rights to the characters, merchandise and games necessary to ESC being

**COMPLAINT FOR NEGLIGENT MISREPRESENTATION AND FRAUD**

able to produce such material without infringing on anyone else's intellectual property ("IP") rights. Insomniac negligently breached the Product Procurement Agreement with ESC by in fact failing to hold the requisite IP rights necessary to fulfil its obligations under its agreements with ESC.

34.    At all times, ESC performed all of its obligations under the Product Procurement Agreement or was prevented by Insomniac from performing.

35.    At no time and in no manner was Insomniac's performance under the Product Procurement Agreement excused.

36.    As a direct and proximate result of Insomniac's negligence, ESC has sustained economic injury for which it is entitled to monetary compensation in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### Fraud

37.    ESC repeats and alleges each and every allegation above as if fully set forth herein.

38.    Insomniac granted ESC the Sunset Overdrive graphic tees and Ratchet & Clank graphic tees, which ESC actually produced. As part of that grant, Insomniac represented that it possessed the necessary IP rights for ESC to perform.

39.    Insomniac, in making those representations, deliberately lied, and further concealed its deceit when ESC began asking why the production contracts were not  being implemented.

40.    At all times, ESC performed all of its obligations under the Fulfillment Agreement or was prevented by Insomniac from performing.

41.    At no time was ESC made aware of the true facts which, if known, would have put it on notice that Insomniac was lying to it.

42.    As a direct and proximate result of Insomniac's fraud, ESC has sustained economic injury for which it is entitled to monetary compensation in an amount to

COMPLAINT FOR NEGLIGENT MISREPRESENTATION AND FRAUD

be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, ESC seeks the following relief:

    A.    Compensatory, consequential and punitive damages, past and future, in an amount to be determined at trial.

    B.    Pre-judgment and post-judgment interest at the maximum rate allowed by law.

    C.    Such other and further relief as the Court may deem appropriate under the circumstances.

    Respectfully submitted,

DATED:    December 22, 2025

Paul J. Steiner
LAW OFFICES OF PAUL J. STEINER
Frank S. Sommers IV
SOMMERS LAW PC

**COMPLAINT FOR NEGLIGENT MISREPRESENTATION AND FRAUD**

**JURY DEMAND**

ESC hereby demands a trial by jury on all issues and claims so triable.


DATED:          December 22, 2025

_____
Paul J. Steiner
LAW OFFICES OF PAUL J. STEINER
Frank S. Sommers IV
SOMMERS LAW PC

**COMPLAINT FOR NEGLIGENT MISREPRESENTATION AND FRAUD**

# EXHIBIT A

**ESC Product Procurement Agreement**

This ESC Product Procurement Agreement ("***Product Agreement***") is made and entered on this 1st day of May, 2018 ("***Effective Date***"), by and between ESC Toy Ltd, with offices at 6625 S. Valley View Blvd, Suite 328/330, Las Vegas, NV 89118, USA ("***ESC***"), and Insomniac Games Inc., a California corporation with an office at 2255 N. Ontario Street, Suite 550, Burbank, CA 91504 ("*/nsomniac"*). ESC and Insomniac sometimes are referred to individually as a "***Party***" and collectively as the "***Parties***".

WHEREAS, Insomniac wishes to engage ESC to produce various items of merchandise under license from and at the direction and expense of Insomniac, and ESC agrees to be engaged for such production, pursuant to the terms and subject to the conditions hereafter provided.

NOW THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.     **ESC Fulfillment Agreement**. Contemporaneous with the execution of this Product Agreement, and with the same Effective Date, the Parties acknowledge entering into the ESC Fulfillment Agreement ("***Fulfillment Agreement***"), which Fulfillment Agreement is incorporated in this Product Agreement by this reference. Pursuant to the Fulfillment Agreement, Insomniac grants ESC an exclusive license to warehouse, distribute and sell Insomniac Merchandise produced by ESC, in connection with the ESC digital fulfillment service ("***Fulfillment Service***"), for an initial Term of three years, as more fully described in Section 9 below. The purpose of this Product Agreement is to establish the terms and conditions by which Insomniac, also on an exclusive basis, grants ESC the right to produce the Insomniac Merchandise that is the subject of the Fulfillment Service.

2.     **Insomniac Merchandise**

2.1     For purposes of this Product Agreement and the Fulfillment Agreement, "***Insomniac Merchandise***" means only those specific items of consumer merchandise produced by ESC for and at the direction of Insomniac that are based upon Insomniac IP, as hereafter defined, and are identified in Exhibit A to this Product Agreement, which Exhibit A may be amended from time to time during the Term of this Product Agreement by the mutual written consent of the Parties. ESC acknowledges that it has no claim to produce merchandise based on Insomniac IP that is not approved in Exhibit A. Insomniac will not license products to third parties that are substantially similar to the Insomniac Merchandise in the following objective respects: dimensions, materials of manufacture, overall appearance, play feature (e.g., windup mechanism), distribution channels, and retail price.

2.2     Insomniac shall at all times retain full legal ownership of all Insomniac Merchandise prior to sale to a customer. Insomniac shall bear all shipping fees in connection with delivery of all Insomniac Merchandise inventory from the point of production to ESC's designated warehouse. ESC shall not assert a lien of any sort or any other restriction on Insomniac's ownership. ESC shall not have the right to offset any payment that may become due from

Insomniac to ESC by seizing, liquidating, selling or transferring any of the Insomniac Merchandise inventory to a third party in exchange for payment of such overdue payment.

3.      **ESC License to Produce**

3.1      Insomniac represents and warrants that it is either the exclusive owner or the licensee with full authority to sublicense intellectual property in the form of the designs, graphic images, character and object names, storylines, gameplay, sounds, dialogue and other distinct elements and features derived from video games developed by Insomniac, and which are incorporated in the Insomniac Merchandise (collectively the "*Insomniac IP*"). The Insomniac IP includes the rights to trademarks, copyrights, patents, designs, graphic images, and associated intellectual property owned by Insomniac, or licensed to Insomniac by the owner of such rights. Subject to the terms of this Product Agreement, Insomniac hereby grants to ESC the exclusive, worldwide, nonassignable but sublicensable revocable (as provided in Sections 9.2 and 9.3 herein), royalty free and fully paid, right and license or sublicense, as the case may be, to design and manufacture, and to cause subcontractors of ESC to design and manufacture, the Insomniac Merchandise based upon the Insomniac IP for the Term of this Product Agreement.

3.2      ESC shall remain fully and directly liable to Insomniac for the performance of its subcontractors to the same extent as if the performance was by ESC itself. Prior to subcontracting with any third party to design or manufacture, or both, any of the Insomniac Merchandise, ESC will notify Insomniac in writing of its intention to subcontract, the name and pertinent information of the proposed subcontractor, including the manufacturing facility location and the items of Insomniac Merchandise intended for design or manufacture, or both, by the proposed subcontractor. Insomniac shall have ten (10) business days from the date of receipt of such notice to accept or reject in writing the proposed subcontractor, which acceptance shall not be unreasonably denied. Insomniac acknowledges and agrees that information regarding any proposed ESC subcontractor is ESC's Confidential Information the disclosure and use of which are governed by Section 6 below. Notwithstanding anything to the contrary in Section 6 below, Insomniac agrees for the Term of this Product Agreement, and for three (3) years after its expiration or earlier termination, that Insomniac or any of its subsidiaries, affiliates or related entites will not circumvent ESC and contact directly any subcontractor disclosed to Insomniac by ESC. For clarity, it shall not constitute a direct contact of an ESC subcontractor by Insomniac if Insomniac contracts with another manufacturer that has a pre-existing relationship with the subcontractor, and Insomniac has not communicated the identity of the subcontractor to the other manufacturer.

4.      **Insomniac Approval of Insomniac Merchandise and Use of Insomniac IP**

4.1      Prior to the commercial release of any of the Insomniac Merchandise, ESC will consult with Insomniac about the form, features, and use of the Insomniac IP in the Insomniac Merchandise, and on related and packaging and promotional materials. Once agreement is reached by the Parties as to an item or items of Insomniac Merchandise to be produced by ESC, the Parties will execute a purchase order ("*PO*") to be mutually agreed upon by the Parties. The PO shall describe and illustrate in reasonable detail the item or items to be produced, the costs of design and set-up for any Prototype of the item, the number of units to be produced, the per-unit cost of

manufacture, any per-unit licensee fee or royalty to a third party, and the suggested retail price per unit. The PO shall also state the method and manner of payment by Insomniac to ESC. Thereafter, and with sufficient advanced notice to Insomniac to permit changes requested by Insomniac, ESC will provide Insomniac with the final pre-production digital and physical model of each of the Insomniac Merchandise ("***Prototype***") prior to its/their release for manufacture. For Prototypes whose cost to produce is $1,000 or less, ESC shall deliver the Prototype to Insomniac by an expedited and secure mode of delivery, the costs of which shall be paid by Insomniac. For Prototypes whose cost to produce exceeds $1,000, the Parties shall discuss the most secure and expedient means for Insomniac's review, which may include personnel of Insomniac travelling to ESC's headquarters at Insomniac's expense to view the Prototype. The Parties may agree on an alternate method of submission other than a final pre-production physical model, which agreed alternate submission shall then be deemed the Prototype for all purposes of this Agreement. Insomniac will notify ESC of its acceptance, or request for any changes, to the Prototype in writing within ten (10) business days of receipt of the Prototype, acceptance not to be unreasonably withheld. Once Insomniac and ESC agree on the final form of the Prototype, ESC shall not have the right to make any material alterations to the Prototype without first resubmitting the revised Prototype to Insomniac for its further approval. Changes that do not alter the essential nature, appearance or quality of the Insomniac Merchandise shall not be deemed material. Insomniac will notify ESC of its acceptance, or request for any changes, to the resubmitted Prototype in writing within ten (10) business days of receipt of the resubmitted Prototype, acceptance not to be unreasonably withheld. Insomniac's failure to respond to the submission or resubmission of a Prototype within the time provided shall be deemed consent. The Parties will act with commercial reasonableness in order to adapt the Insomniac Merchandise into a form suitable for manufacture and/or merchandising.

4.2     ESC warrants and agrees that the Insomniac Merchandise will conform in all respects to the "***Quality Standard Requirements***" set forth in Exhibit B attached to this Agreement and incorporated by this reference. Insomniac has the right to suspend or revoke the license provided in this Product Agreement for any Insomniac Merchandise that is in material violation of one or more of the standards provided in Exhibit B. Insomniac has the right to seek injunctive relief in any court with applicable jurisdiction to prevent the sale of any Insomniac Merchandise based upon its reasonable belief, after due inquiry, that such Insomniac Merchandise is injurious to public health or safety, or otherwise violates the Quality Standard Requirements.

4.3     ESC will provide appropriate notice of Insomniac's patents, trademarks and copyrights on each of the Insomniac Merchandise as provided in the Insomniac Branding Guide, which will be provided by Insomniac. ESC will take no action to claim ownership of or dispute the right of Insomniac to exclusive ownership of the patents, trademarks and copyrights constituting the Insomniac IP.

4.4     To the extent agreed to by the Parties, the Insomniac Merchandise may also contain appropriate notice of relevant ESC patents, trademarks and copyrights. Insomniac will take no action to claim ownership of or dispute the right of ESC to exclusive ownership of ESC's patents, trademarks and copyrights.

5.      **Taxes**

5.1      ESC will be responsible for determining and paying any and all federal, state, and local taxes ESC may owe on the payments made by Insomniac for the production of the Insomniac Merchandise. All remittances sent to ESC by Insomniac shall be inclusive of all applicable sales and transaction taxes. If Insomniac is required to pay any such taxes on ESC income, the amount of such taxes and all related interest, fines, or penalties, if any, shall become immediately due and payable to Insomniac. Insomniac shall have the right to collect and pay any applicable taxes owed by ESC in connection with the production of Insomniac Merchandise if reasonably required to do so by a taxing authority of competent jurisdiction, and shall further have the right to recover from ESC the amount of any such taxes and related penalties and interest, if any, from payments otherwise due to ESC. Insomniac agrees to notify ESC promptly, but in no event more than five (5) days after learning of any such tax-related government claim against ESC and to cooperate fully with ESC in the resolution of such claim.

5.2     Insomniac will be responsible for determining and paying any and all federal, state, and local taxes Insomniac may owe on the payments made by ESC to Insomniac in connection with the sale of the Insomniac Merchandise. All remittances sent to Insomniac by ESC shall be inclusive of all applicable sales and transaction taxes. If is required to pay any such taxes on Insomniac income, the amount of such taxes and all related interest, fines, or penalties, if any, shall become immediately due and payable to ESC. ESC shall have the right to collect and pay any applicable taxes owed by Insomniac in connection with the sale of Insomniac Merchandise if reasonably required to do so by a taxing authority of competent jurisdiction, and shall further have the right to recover from Insomniac the amount of any such taxes and related penalties and interest, if any, from payments otherwise due to Insomniac. ESC agrees to notify Insomniac promptly, but in no event more than five (5) days after learning of any such tax-related government claim against Insomniac and to cooperate fully with Insomniac in the resolution of such claim.

6.      **Confidentiality**

6.1      As used in this Product Agreement, "*Confidential Information*" means any information of whatever kind or form, including without limitation an idea, invention, formula, algorithm, computer program, research, technique, know how, internal procedure or method of operation, marketing plan, product release plan, pricing plan, lists of customers, clients, contacts, contractors or vendors, business or financial data or accounts, prices, costs, business relationships, contractual rights, and trade secrets, that the disclosing Party makes known to the receiving Party as a result of and pursuant to this Product Agreement, except to the extent of the following: (i) information that is or becomes known to the general public other than through a breach of the nondisclosure obligations of this Product Agreement by the receiving Party; (ii) information that is customarily disclosed to others without restriction on subsequent disclosure; (iii) information that was known to the receiving Party prior to the Effective Date or the receiving Party can demonstrate was independently developed by the receiving Party during the Term; (iv) information that is obtained by the receiving Party from a third party other than through a breach of the nondisclosure obligations of this Product Agreement; and (v) information to the limited extent that disclosure is expressly required by judicial or administrative order, or otherwise is required by applicable law.

6.2     During the Term of this Product Agreement, and for three (3) years after the expiration or termination of this Product Agreement, the receiving Party shall maintain all Confidential Information in strictest secrecy and guard against unauthorized disclosure. The receiving Party shall not directly or indirectly use, sell, transfer, convey, disseminate, disclose, or publish any Confidential Information except with the advanced written approval of the disclosing Party. Neither Party shall disclose the terms of this Product Agreement without the prior written consent of the other Party.

7.      **Risk of Loss**. ESC bears all risk of loss of the Insomniac Merchandise produced by ESC from the moment of its creation until completion of ESC obligations with respect to such Insomniac Merchandise pursuant to the Fulfillment Agreement.

8.      **Insurance.**  During the Term of this Product Agreement, ESC shall obtain all the necessary insurance to cover all Insomniac Merchandise inventory in the possession or control of ESC (including its approved subcontractors, if any) from the moment of production, including property and casualty insurance coverage proportionate to the amount of the Insomniac Merchandise ordered. ESC will cover the Insomniac Merchandise inventory in case of loss or destruction during transit to the ESC warehouse.

9.      **Term and Termination**

9.1     This Product Agreement shall commence on the Effective Date and shall continue for a period of three (3) years, renewable for successive one-year periods upon mutual written consent of the Parties, or unless sooner terminated as set forth in Subsections 9.2 and 9.3 ("***Term***"). Upon expiration or earlier termination as provided in this Section 9, the license provided in Section 3 shall cease and be of no further force or effect. ESC immediately shall end all production of the Insomniac Merchandise. ESC shall not thereafter manufacture or sell or otherwise deal in the Insomniac Merchandise, subject to six-months sell off, nor shall ESC sell or transfer the tooling for the Insomniac Merchandise without the prior written consent of Insomniac, which Insomniac may deny in its sole discretion.

9.2     Either Party may elect to terminate this Product Agreement due to a material breach of this Product Agreement by the other Party that remains uncured more than thirty (30) days after written notice of breach and the grounds for asserting breach are provided to the Party in default. Any such termination shall not relieve the Party in default of its obligations and is not the exclusive remedy available for such breach.

9.3     In the case of the receivership or bankruptcy of ESC, Insomniac shall have the right to terminate this Product Agreement effective at any time thereafter by giving ESC thirty (30) days notice in writing, provided that such condition has not been corrected within that thirty (30) day period.

9.4     Sections 5, 6, 7, 8, 9, 10, 11, 12, 13, 15 and 17 of this Product Agreement shall survive its expiration or earlier termination.

9.5.    In case of termination of this Agreement for any reason, all outstanding orders shall be paid for in full by Insomniac before all goods are shipped.

10.    **Relationship**. The Parties acknowledge and agree that ESC is a licensee of Insomniac, and neither Party is an agent, partner, representative or joint venturer of the other. ESC will not represent its relationship with Insomniac other than as a licensee of Insomniac, and neither Party shall enter into any contracts on behalf or in the name of the other Party without the express prior written approval of the other Party.

11.    **Warranties & Representations.**

11.1    Insomniac warrants and represents to ESC that: (i) it is duly organized and validly existing in all jurisdictions in which it maintains operations, and it has the authority to enter into this Agreement; (ii) it is under no known existing legal or financial impediment, including pending or threatened litigation, adverse judgments or settlements; (iii) it will not permit a lien, judgment or other encumbrance to be placed by a third party on the Insomniac Merchandise in connection with a claimed obligation owed by Insomniac, (iv) Insomniac will not engage in any activity during the Term whose harm to the reputation and goodwill of ESC is reasonably foreseeable and (vi) it has all the rights necessary for the grant of the above rights to ESC and has obtained all clearances and consents required for (1) the production of the Insomniac Merchandise, (2) the exercise by ESC of the licenses or sublicenses granted hereunder, including, without limitation, all clearances and consents required from third-party licensors in connection with Insomniac Merchandise; (3) the production and sale of Insomniac Merchandise will not violate or infringe the rights of any third party(ies); (4) the production of Insomniac Merchandise will not require payment by ESC to any third party(ies); and (5) Insomniac Merchandise to the extent it incorporates Insomniac IP or the intellectual property of any third party provided by Insomniac to ESC will not violate any law or regulation.

11.2    ESC warrants and represents to Insomniac that: (i) it is duly organized and validly existing in all jurisdictions in which it maintains operations, and it has the authority to enter into this Agreement;  (ii) it is under no known existing legal or financial impediment, including pending or threatened litigation, adverse judgments or settlements, (iii) it will not permit a lien, judgment or other encumbrance to be placed by a third party on the Insomniac Merchandise in connection with a claimed obligation owed by ESC, and (iv) ESC will not engage in any activity during the Term whose harm to the reputation and goodwill of Insomniac is reasonably foreseeable, including a violation of the Quality Standard Requirements.

12.    **Indemnification**. ESC and Insomniac each agrees to indemnify, defend and hold the other Party and its respective officers, employees, directors and representatives (collectively the "*Indemnified Party*") harmless from and against any and all third party claims, judgments, damages and expenses (including without limitation reasonable outside attorneys' fees) arising out of any breach or alleged breach by the indemnifying Party of any of the warranties, representations, undertakings, or agreements made by the indemnifying Party herein.

12.1    In the event ESC or Insomniac receive notice from a third party challenging Insomniac's rights in any of Insomniac Merchandise, Insomniac and ESC shall immediately notify

each other in writing of such a claim. Insomniac shall immediate assume all costs associated with such claim, including costs of investigation, settlement or litigation, unless caused by a breach of ESC's warranties and representations herein. In no event shall Insomniac settle any claim of third party personal injury or damage without the approval of ESC, such approval to be conditioned upon the full release of ESC from all liability. In the event ESC is not a party to such claim, Insomniac shall have the responsibility to keep ESC fully informed of developments until the matter is finally resolved.

12.2    In the event ESC or Insomniac receive notice from a third party alleging injury or damage as a result of a defect in production of any Insomniac Merchandise, ESC and Insomniac shall immediately notify each other in writing of such claim. ESC shall immediate assume all costs associated with such claim, including costs of investigation, settlement or litigation, unless caused by a breach of Insomniac's warranties and representations herein. In no event shall ESC settle any claim of third party personal injury or damage without the approval of Insomniac, such approval to be conditioned upon the full release of Insomniac from all liability. In the event Insomniac is not a party to such claim, ESC shall have the responsibility to keep Insomniac fully informed of developments until the matter is finally resolved.

## 13.    Exclusions and Limitations

13.1    **EXCLUSION OF DAMAGES.** NEITHER ESC NOR INSOMNIAC WILL BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE OR SPECIAL DAMAGES (INCLUDING DAMAGES RELATING TO LOST PROFITS, OR LOST DATA) ARISING OUT OF, RELATING TO OR CONNECTED WITH THE USE OF THE FULFILLMENT SERVICE, BASED ON ANY CAUSE OF ACTION, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

13.2    Intentionally omitted.

14.    **Notice**. Any notice under this Product Agreement will be in writing and will be personally delivered, sent by a reputable overnight mail courier (e.g. Federal Express) or by registered mail, or by email provided receipt is acknowledged or shown in writing. Notices will be deemed effective if sent to the address of the receiving Party that appears above (or that Party's email address set forth below for email) (a) five (5) working days after deposit, postage prepaid, if mailed, (b) upon electronic delivery confirmation if sent by overnight mail courier, or (c) the same day if sent by facsimile during the receiver's normal business hours (or the following day if sent after normal business hours) and confirmed as set forth above.

ESC
Email: ___erickscarecrow@gmail.com___
Attention: ___Erick scarecrow___

Insomniac
Email: jhuang@insomniacgames.com
Attention: Jen Huang

15.     **Governing Law.** Any claim or dispute arising out of or in connection with this Product Agreement shall be governed by laws of the State of California applicable to agreements deemed entered into and wholly performed therein. Each Party grants to the state and federal courts located in Los Angeles, California, exclusive jurisdiction to hear any claim or dispute arising out of this Product Agreement.

16.     **Assignment**. ESC shall not have the right to assign this Product Agreement under any circumstances. Any such attempted assignment shall be void. Insomniac shall not have the right to assign any of its rights or obligations under this Product Agreement other than to a financially responsible party acquiring all or a majority of Insomniac's assets and assuming all of its obligations and liabilities in writing

17.     **Miscellaneous**. The failure of either Party to enforce any provision of this Product Agreement will not constitute a waiver of the Party's right to subsequently enforce that provision. Any waivers granted hereunder are effective only if recorded in writing and signed by the Party granting such waiver. If any provision of this Product Agreement is determined by any court or governmental authority to be unenforceable, the remainder of this Product Agreement shall continue in full force and effect, and the unenforceable provision shall be replaced by a provision that most closely meets the commercial intent of the Parties. This Agreement constitutes the entire agreement of the Parties relating to the subject matter of this Product Agreement. This Product Agreement may be signed by the Parties in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument. Signatures hereof submitted via facsimile transmission or other electronic means shall be deemed an original signature, valid and binding to all intents and purposes.

**IN WITNESS WHEREOF**, the Parties have duly executed this Product Agreement as of the Effective Date.

**ESC-Toy, Ltd**                                              **Insomniac Games, Inc.**

By: _____                 By: _____
Name:    Erick scarecrow                          Ted Price

Title:                                                              President / CEO
        PREsIDENT

**ESC Product Procurement Agreement**

## EXHIBIT A

## APPROVED INSOMNIAC MERCHANDISE

(Additional items of Insomniac Merchandise may be added subject to good faith negotiations)

### Merchandise

RATCHET & CLANK
    collectible figure set (TRIBUTE)
RATCHET & CLANK
    plush set (2 designs)
RATCHET & CLANK
    graphic tees (4 designs)
RATCHET & CLANK
    collectible pins (4 designs)
RATCHET & CLANK
    Blindbox series (16 designs)
RATCHET & CLANK
    collector set (includes game &
    merchandise) Could be for either PS4 or PS5
INSOMNIAC
    graphic tees (4 different designs)
RESISTANCE
    graphic tees (2 different designs)
SPYRO
    graphic tee
SPYRO
    plush collectible (1 design) exclusive to shop
SPYRO
    collectible figure (1 design TRIBUTE) exclusive to shop
SUNSET OVERDRIVE
    plush collectible (1 design)
SUNSET OVERDRIVE
    collectible pins (2 designs)
SUNSET OVERDRIVE
    graphic tees (1 design)
SPIDER-MAN PS4
    exclusive merchandise for IG Shop.
    graphic tees (4 different designs)
    collectible figure (2 different designs)
    plush (1 design)

ESC Product Procurement Agreement

## EXHIBIT B

### QUALITY STANDARD REQUIREMENTS

1.    The Insomniac Merchandise is to be manufactured and sold by ESC pursuant to this Product Procurement Agreement and in strict compliance with all applicable federal, state and local laws and regulations, and all industry standards and regulations. On a periodic basis, ESC may be required to provide documentation of such compliance, including but not limited to, evidence of certifications, copies of test results, if funded by Insomniac, copies of applicable approvals, and copies of design review documents if applicable. If ESC intends to re-badge an existing product it previously sold under a different brand to create Insomniac Merchandise, or will concurrently sell products otherwise identical to the Insomniac Merchandise except for the badging,  Insomniac may also request information concerning the brand names under which ESC is marketing the other products, the territories in which ESC is marketing the other products, the differences if any between the other products and the Insomniac Merchandise, Consumer Product Safety Commission ("**CPSC**") recalls or field incident/investigation reports, if any, and how the Insomniac Merchandise address technology or design problems cited in CPSC reports for the product category.

2.    The Insomniac Merchandises shall be of high quality in design, material and workmanship and suitable for the purpose intended.

3.    Words, shapes, or devices that are obscene or scandalous are unacceptable and prohibited.

4.    When affixed to Insomniac Merchandise, the Insomniac IP shall be clear and legible without bleeding of line or color.

5.    Insomniac Merchandise involving fabric in their construction must be made of shrink resistant material and shall be of sufficient weight as to withstand ordinary wear. Textile and leather goods shall be resistant to tearing and, if dyed, shall be of fade resistant colors, in accordance with testing results.

6.    All Insomniac Merchandise shall be made of non-toxic and non-allergenic material and shall not contain small items or breakable pieces that could be injurious to children, in accordance with testing results.

7.    In accordance with testing results, no injurious, deleterious or toxic substances will be used in or on the Insomniac Merchandise.

8.    The Insomniac Merchandise will not cause harm when used as instructed and with ordinary care for their intended purpose.

9. ESC will use commercially reasonable efforts to provide use and care instructions on the Insomniac Merchandise that are useful, understandable, and accurate.

10. Forced Labor: ESC, on its own behalf and to the best of ESC's knowledge and belief on behalf of its subcontractors, will not do business with third parties that use forced labor, prison labor, indentured labor or bonded labor, or permit their suppliers or subcontractors to do so.

11. Child Labor: To the best of ESC's knowledge and belief, ESC, on its own behalf and on behalf of its subcontractors, will not purchase, distribute, or utilize in any other manner products or components thereof manufactured by persons younger than 15 years of age or younger than the age of completing compulsory education in the country of manufacture where such age is higher than 15.

12. Harassment or Abuse: ESC and its subcontractors must treat their employees with respect and dignity. No employee of ESC, and to the best of ESC's knowledge and belief no employee of its subcontractors, shall be subject to physical, sexual or psychological harassment or abuse.

13. Nondiscrimination: ESC, and to the best of ESC's knowledge and belief its subcontractors, shall not subject any person to discrimination in employment, including hiring, salary, benefits, advancement, discipline, termination or retirement, on the basis of gender, race, religion, age, disability, sexual orientation, nationality, political opinion, or social or ethnic origin.

14. Health and Safety: ESC, and to the best of ESC's knowledge and belief its subcontractors, shall provide a safe and healthy working environment to prevent accidents and injury to health arising out of, linked with, or occurring in the course of work or as a result of the operation of employer facilities in accordance with the laws of the countries in which they are working. ESC and its subcontractors must fully comply with all applicable workplace conditions, safety and environmental laws.

15. Freedom of Association: ESC, and to the best of ESC's knowledge and belief its subcontractors, shall recognize and respect the right of employees to freely associate in accordance with the laws of the countries in which they are employed.

16. Wages and Benefits: ESC, and to the best of ESC's knowledge and belief its subcontractors, recognize that wages are essential to meeting employees' basic needs. ESC and its subcontractors shall pay employees at least the minimum wage required by local law regardless of whether they pay by the piece or by the hour and shall provide legally mandated benefits.

17. Work Hours: ESC and its subcontractors shall not require their employees to work more than the limits on regular and overtime hours allowed by the law of the country of manufacture. Except under extraordinary business circumstances, such employees shall be entitled to no less than one day off in every seven-day period. ESC and its subcontractors

must inform their workers at the time of their hiring if mandatory overtime is a condition of their employment. ESC and its subcontractors shall not compel their workers to work excessive overtime hours.

18.    Overtime Compensation: ESC's and its subcontractors' employees shall be compensated for overtime hours and such premium rate as is legally required in the country of manufacture or, in countries where such laws do not exist, at a rate at least equal to their regular hourly compensation rate.

19.    Legal and Ethical Business Practices: ESC and its subcontractors must fully comply with all applicable local, state, federal, national and international laws, rules and regulations including, but not limited to, those relating to wages, hours, labor, health and safety, and immigration. ESC and its subcontractors must be ethical in their business practices.

20.    Penalties: Insomniac reserves the right to terminate its business relationship with ESC and or any of its subcontractors who violates these Quality Standard Requirements or whose suppliers or subcontractors violate these Quality Standard Requirements. Insomniac reserves the right to terminate this Agreement if ESC fails to provide written confirmation to Insomniac that ESC has a program in place to monitor ESC's subcontractors' suppliers and subcontractors for compliance with these Quality Standard Requirements.

UNREDACTED VERSION OF
DOCUMENT PROPOSED TO
BE FILED UNDER SEAL IN
ITS ENTIRETY

# EXHIBIT B

**ESC Fulfillment Agreement**

This ESC Fulfillment Agreement ("Fulfillment **Agreement**") is made and entered on this 1st day of May, 2018 ("**Effective Date**"), by and between ESC Toy Ltd, with offices at 6625 S. Valley View Blvd, Suite 328/330, Las Vegas, NV 89118, USA ("**ESC**"), and Insomniac Games Inc., a California corporation with an office at 2255 N Ontario St., Suite 550, Burbank, CA 91504 ("**Insomniac**") in connection with Insomniac's use of the ESC on-line digital fulfillment service ("**Fulfillment Service**"). ESC and Insomniac are herein referred individually as a "**Party**" and collectively as the "**Parties**".

WHEREAS, Insomniac wishes to engage ESC as Insomniac's exclusive worldwide Fulfillment Service, and ESC wishes to act as Insomniac's exclusive Fulfillment Service, pursuant to the terms and subject to the conditions hereafter provided.

NOW THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.      **The Term and Services.** ESC shall act as Insomniac's exclusive on-line Fulfillment Service throughout the world for all on-line orders of consumer merchandise identified in the Product Procurement Agreement entered between the Parties contemporaneous with this Fulfillment Agreement ("**Product Agreement**"). Only consumer merchandise identified in the Product Agreement ("**Insomniac Merchandise**") shall be subject to the Fulfillment Service.

(a) The term of this Fulfillment Agreement shall be three (3) year commencing upon the Effective Date ("**Term**"). The Term may be renewed for successive one-year periods upon the mutual written consent of the Parties at least ninety (90) days prior to the expiration date of the current Term. Each such renewal shall be deemed a part of the Term. In the absence of such renewal, this Agreement shall terminate on the expiration date of the current Term.

(b) ESC shall provide customer support, retail and inventory management for all Insomniac Merchandise. Insomniac Merchandise inventory shall be held at ESC's secure warehouse in Las Vegas, or such other location as shall be mutually agreed by the Parties. The Parties agree that ESC shall initially create a signature E-shop using ESC's existing platform with limitedrun.com or Shopify, provided that Insomniac shall have the option to build a more on-line customized platform at any time after the Effective Date. The Parties agree that in case the Shopify platform is used, Insomniac shall pay a monthly subscription fee for such use.

2.      **Intellectual Property and Limited License.** As further set forth in the Product Agreement, Insomniac agrees, warrants and represents that it either owns or has licensed from the lawful rights owners all right, title and interest in and to all Insomniac Merchandise, and all rights therein, including all patent, copyright, trademark, service mark, digital images and other intellectual property or proprietary rights contained therein ("**Insomniac IP**"). Insomniac hereby grants ESC for the Term of this Fulfillment Agreement, a limited-use license, throughout the world, to market, promote, distribute and sell Insomniac Merchandise, and to use the Insomniac IP in conjunction with the marketing of Insomniac Merchandise, upon submission of such ESC marketing materials to Insomniac and its approval, such approval not to be unreasonably withheld. This limited license shall be used solely to connection with the marketing, promotion, distribution and sale of Insomniac Merchandise in accordance with the terms of this Fulfillment Agreement. ESC agrees that this Section 2 is the full expression of the licenses granted by Insomniac to ESC and ESC acquires no rights to the Insomniac IP other than as expressly stated herein. All uses of the Insomniac IP by ESC inure to the benefit of Insomniac. ESC shall not contest for any reason Insomniac's ownership of the Insomniac IP.

3.      **Pricing; Unsold Inventory**. ESC will consult with Insomniac regarding the appropriate price to be charged, and any changes in such price, for each item of the Insomniac Merchandise. Final determination of price shall be by Insomniac. Provided it is in compliance with this Fulfillment Agreement at the end of the Term, any unsold inventory will be the responsibility of Insomniac.

4.      **Marketing**. In addition to the Fulfillment Service to be provided by ESC, ESC shall promote the availability of Insomniac Merchandise on ESC Stream on Twitch and on social media. Insomniac agrees to promote the Insomniac Merchandise on its website and by other means it deems appropriate, including promotion of the on-line store which is managed and fulfilled by ESC via internet and social media.

5.      **Shopify Account/Limitedrun.com Account:** ESC shall establish on the shopify.com website or the limitedrun.com website, and make available to Insomniac, a unique password-protected account access area that will include information about Insomniac's account, such as contact and payment information, inventory, inventory reporting, sales history, specific customer information, payments due to Insomniac, and ESC service fees. Insomniac shall protect its password at all times. ESC shall have no liability to Insomniac for unauthorized disclosure, unless caused by gross negligence or willful misconduct of ESC's employees or contractors.

6.      **Payment for Services.** Fulfillment Service is a fee-based service. ESC fees include a per-transaction fee for every Insomniac Merchandise customer order processed by ESC. The ESC current fee schedule is set forth in Schedule 1 attached hereto and made part hereof. All applicable fees incurred will be automatically deducted from the revenue received by ESC from the sale of Insomniac Merchandise. Commencing six (6) months from the Effective Date, ESC shall have the right to change its fees from time to time upon no less than ninety (90) days prior written notice to Insomniac, provided that in case of price increase, Insomniac shall have the right at any time thereafter to cancel this Fulfillment Agreement upon written notice to ESC.

7.      **Remittances to Insomniac**. ESC will render all payments due to Insomniac on a calendar quarter basis no later than thirty (30) days after the end of each calendar quarter during the Term, each remittance to be accompanied by an accounting statement listing total revenues generated from the sale of Insomniac Merchandise and customary fees and other costs directly incurred by ESC and approved in advance by Insomniac, which approval shall not be unreasonably delayed or denied. The accounting statements should also include a detailed listing of all Insomniac Merchandise sold during the preceding calendar quarter, including SKU, price, and number of units sold. All payments shall be made via PayPal or by bank wire, at Insomniac's election. If no issue as to the accuracy or completeness of any particular accounting statement is raised in writing with ESC by Insomniac within one (1) year of receipt by Insomniac of such accounting statement, such accounting statement shall be deemed accepted by Insomniac and Insomniac shall be precluded from later disputing the accuracy or completeness of such accounting statement.

8.      **Audit Right**. For so long as ESC markets, promotes, distributes and sells Insomniac Merchandise, or receives revenue with respect to the Insomniac Merchandise, or for one (1) calendar year following the expiration or termination of this Fulfillment Agreement, whichever is later, ESC will keep records regarding the sale and revenue of the Insomniac Merchandise. Insomniac may, no more than once each calendar year (and no more than once with respect to any set of ESC accounting statements), upon thirty (30) calendar days' prior written notice, and during the regular business hours of ESC on a mutually agreeable date, have a mutually agreed independent public accountant that is not operating on a contingency fee basis (the "Auditor") conduct an audit of such records for the sole purpose of verifying that the payments made to Insomniac under this Fulfillment Agreement are accurate and complete. ESC shall promptly and fully comply with all relevant requests for information and materials made by the Auditor. In the event the Auditor uncovers for any calendar quarter an underpayment by ESC that is more than five percent (5%) of the amount paid to Insomniac during that calendar quarter, then ESC shall pay all of the reasonable fees and expenses of the Auditor. In all other events, Insomniac will be solely responsible for all costs and expenses of conducting the audit. ESC will pay any undisputed underpayment to Insomniac no later than sixty (60)

2

days after receiving an invoice from Insomniac setting forth the amount of the underpayment established by the audit. If Insomniac discovers (via audit or otherwise) an overpayment by ESC in any amount, then

Insomniac will promptly notify ESC in writing and the amount of the overpayment will be deducted by ESC from the next payment to Insomniac (or reimbursed by Insomniac if the discovery occurs after the Term). If the audit does not show any discrepancy, then ESC's audited payments will be conclusive and Insomniac waives any right to claim additional payment for the payments under audit.

9.    **Taxes.** Insomniac will be responsible for determining and paying any and all federal, state, and local taxes Insomniac may owe on the sales processedthrough the ESC Fulfillment Service. All remittances sent to Insomniac by ESC shall be inclusive of all applicable sales and transaction taxes. If ESC is required to pay any such taxes on Insomniac income, the amount of such taxes and all related interest, fines, or penalties, if any, shall become immediately due and payable to ESC. ESC shall have the right to collect and pay any applicable taxes including but not limited to excise tax, sales tax, or use tax on Insomniac's behalf or on account of its own sales of Insomniac Merchandise if reasonably required to do so by a taxing authority of competent jurisdiction, and shall further have the right to recover from Insomniac the amount of any such taxes and related penalties and interest, if any, from fees otherwise due to Insomniac. ESC agrees to notify Insomniac promptly, but in no event more than five (5) days after learning of any such tax-related government claim against Insomniac and to cooperate fully with Insomniac in the resolution of such claim.

10. **Confidentiality**.

   (a) As used in this Agreement, "**Confidential Information**" means any information of whatever kind or form, including without limitation an idea, invention, formula, algorithm, computer program, research, technique, know how, internal procedure or method of operation, marketing plan, product release plan, pricing plan, lists of customers, clients, contacts, contractors or vendors, business or financial data or accounts, prices, costs, business relationships, contractual rights, and trade secrets, that the disclosing Party makes known to the receiving Party as a result of and pursuant to this Fulfillment Agreement, except to the extent of the following: (i) information that is or becomes known to the general public other than through a breach of the nondisclosure obligations of this Fulfillment Agreement by the receiving Party; (ii) information that is customarily disclosed to others without restriction on subsequent disclosure; (iii) information that was known to the receiving Party prior to the Effective Date or the receiving Party can demonstrate was independently developed by the receiving Party during the Term; (iv) information that is obtained by the receiving Party from a third party other than through a breach of the nondisclosure obligations of this Fulfillment Agreement; and (v) information to the limited extent that disclosure is expressly required by judicial or administrative order, or otherwise is required by applicable law.

   (b) During the Term of this Agreement, and for three (3) years after the expiration or termination of this Fulfillment Agreement, the receiving Party shall maintain all Confidential Information in strictest secrecy and guard against unauthorized disclosure. The receiving Party shall not directly or indirectly use, sell, transfer, convey, disseminate, disclose, or publish any Confidential Information except with the advanced written approval of the disclosing Party. Neither Party shall disclose the terms of this Fulfillment Agreement without the prior written consent of the other Party.

11.    **Risk of Loss.** All items purchased from ESC by customers are made pursuant to a shipment contract. This means that risk of loss and title for such items pass to the customer upon delivery to the carrier. ESC shall add insurance to shipping costs for loss items in post. ESC agrees that Insomniac shall have no liability for customer loss resulting from an ESC shipment to a customer.

12.    **Customer Returns and Replacements**.

3

(a) <u>Defective Insomniac Merchandise</u>. In the event a purchaser returns a defective item of Insomniac Merchandise for which ESC is the procuring Party pursuant to the Product Agreement, then Insomniac shall have no obligation for such defective item and all costs shall be the responsibility of ESC. In addition, for replacements in the case of defective merchandise, ESC agrees to bear the cost of re-shipping replacement merchandise, as applicable, to customers.

(b) <u>Insomniac Merchandise Damaged in Transit</u>. In the event a purchaser returns an item of Insomniac Merchandise that was damaged while in transit but was not a defective product, ESC will be solely responsible for either refunding the purchaser or shipping another product at ESC's sole costs and expense.

(c) <u>Products Damaged at ESC Warehouse</u>. If any item of Insomniac Merchandise under the control of ESC is damaged while in the ESC warehouse, Insomniac shall be entitled to one hundred percent (100%) reimbursement in the next calendar quarter accounting for such damage. ESC assumes the risk of loss of Insomniac Merchandise while held by ESC it its facility.

13.    **Ownership of Insomniac Merchandise.** Insomniac shall at all times retain full legal ownership of all Insomniac Merchandise prior to sale to a customer. Insomniac shall bear all shipping fees in connection with delivery of all Insomniac Merchandise inventory to ESC's designated warehouse. ESC shall not assert a lien of any sort or any other restriction on Insomniac's ownership. ESC shall not have the right to offset any payment that may become due from Insomniac to ESC by seizing, liquidating, selling or transferring any of the Insomniac Merchandise inventory to a third party in exchange for payment of such overdue payment.

14.    **Inventory Report.** Insomniac acknowledges and agrees that the inventory data provided in real-time from limitedrun.com or Shopify is estimated. The actual quantity may be different due to time gap of orders in process and reconciling returns and replacements. From time-to-time, but no less often that each calendar quarter, ESC will audit the inventory at its warehouse and update the inventory data accordingly.

15.    **Service Interruption.** ESC shall use commercially reasonable efforts to maintain ESC Fulfillment Service up-time interruption-free as much as possible. Notwithstanding the foregoing, the Parties acknowledge, that occasionally there may be service interruptions due to factors outside of ESC control, including factors inherent to computer systems, software, Internet communication, electrical supply, and other systems ESC depends on to maintain the Fulfillment Service. In addition, from time-to-time, ESC may need to interrupt the Fulfillment Service in order to perform regularly scheduled maintenance or make upgrades to the system. ESC will not be responsible any lost sales or presumed lost sales during these service interruptions. ESC shall inform Insomniac in writing at least five (5) business days in advance of any anticipated interruption, scheduled maintenance or upgrades to the system that will effect sales of Insomniac Merchandise.

16.    **Insurance.** ESC shall obtain all the necessary insurance to cover all Insomniac Merchandise inventory held at the ESC warehouse, including property and casualty insurance coverage in the amount of $1 million. ESC will cover the Insomniac Merchandise inventory in case of loss or destruction while at the ESC warehouse. ESC recommends that Insomniac obtain additional coverage under its own insurance policy for the replacement cost of Insomniac Merchandise.

17.    **Warranties & Representations.**

(a) Insomniac warrants and represents to ESC that: (i) it is duly organized and validly existing in all jurisdictions in which it maintains operations, and it has the authority to enter into this Agreement; and (ii) it has obtained all clearances and consents required for (1) the marketing, promotion, distribution and sale of the Insomniac Merchandise, (2) the exercise by ESC of the licenses granted hereunder, including, without limitation, all clearances and consents required from rights holders, if any, in connection with Insomniac Merchandise; (3) the sale of Insomniac Merchandise will not violate or

4

infringe the rights of any third party(ies); (4) the sale or other use of Insomniac Merchandise will not require payment by ESC to any third party(ies); and (5) Insomniac Merchandise will not violate any law or regulation.

(b) ESC warrants and represents to Insomniac that: (i) it is duly organized and validly existing in all jurisdictions in which it maintains operations, and it has the authority to enter into this Agreement;  (ii) it is under no known existing legal or financial impediment, including pending or threatened litigation, adverse judgments or settlements, (iii) it will not permit a lien, judgment or other encumbrance to be placed by a third party on the Insomniac Merchandise in connection with a claimed obligation owed by ESC, and (iv) ESC will not engage in any activity during the Term whose harm to the reputation and goodwill of Insomniac is reasonably foreseeable, including (1) the sale of Insomniac Merchandise at a significant discount from the original price or that is falsely described to consumers, and (2) the sale of third party merchandise that is obscene, pornographic, promotes violence, discriminates against any group.

18.    **Indemnification**. ESC and Insomniac each agrees to indemnify, defend and hold the other Party and the its respective officers, employees, directors and representatives (collectively the **"Indemnified Party"**) harmless from and against any and all third party claims, judgments, damages and expenses (including without limitation reasonable outside attorneys' fees) arising out of any breach or alleged breach by the indemnifying Party of any of the warranties, representations, undertakings, or agreements made by the indemnifying Party herein.

(a) In the event Insomniac receives notice from a third party challenging Insomniac's rights in any of Insomniac Merchandise, Insomniac shall immediately notify ESC in writing of such a claim. ESC shall have the right in its sole discretion to determine whether to keep or remove the product in question from the Fulfillment Service. If ESC decides to remove the product, repositioning of the product back into the Fulfillment Service is not guaranteed. Any revenues generated from the sale may be withheld until a binding settlement or judgment is reached between Insomniac and the claimant, and specific instructions are provided to ESC by a competent authority regarding dispersing funds.

(b) In the event ESC receives notice from a third party alleging injury or damage as a result of a defect in any Insomniac Merchandise, ESC shall immediately notify Insomniac in writing of such claim. ESC shall immediate assume all costs associated with such claim, including costs of investigation, settlement or litigation. In no even shall ESC settle any claim of third party personal injury or damage without the approval of Insomniac, such approval to be conditioned upon the full release of Insomniac from all liability. In the event Insomniac is not a party to such claim, ESC shall have the responsibility to keep Insomniac fully informed of developments until the matter is finally resolved.

**19.    Disclaimers, Exclusions, and Limitations.**

**(a) <u>DISCLAIMER OF WARRANTIES.</u>** ESC PROVIDES THE FULFILLMENT SERVICE ON AN "AS IS" AND "AS AVAILABLE" BASIS. ESC DOES NOT REPRESENT OR WARRANT THAT THE FULFILLMENT SERVICE OR ITS USE: (i) WILL BE UNINTERRUPTED, OR (ii) WILL BE FREE OF INACCURACIES OR ERRORS BEYOND THE CONTROL OF ESC.

**(b) <u>EXCLUSION OF DAMAGES.</u>** NEITHER ESC NOR INSOMNIAC WILL BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE OR SPECIAL DAMAGES (INCLUDING DAMAGES RELATING TO LOST PROFITS, OR LOST DATA) ARISING OUT OF, RELATING TO OR CONNECTED WITH THE USE OF THE FULFILLMENT SERVICE, BASED ON ANY CAUSE OF ACTION, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**(c) LIMITATION OF LIABILITY.** EXCEPT FOR A BREACH OF A PARTY'S REPRESENTATIONS AND WARRANTIES UNDER THIS AGREEMENT, THE VALUE OF LOST OR DAMAGED INSOMNIAC MERCHANDISE LOCATED AT THE ESC WAREHOUSE, OR IN CONNECTION WITH EITHER PARTY'S INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT, IN NO EVENT WILL THE LIABILITY OF EITHER PARTY TO THE OTHER PARTY IN CONNECTION WITH THIS AGREEMENT EXCEED ONE HUNDRED THOUSAND DOLLARS ($100,000.00).

20.      **Termination**. Either party may terminate this Fulfillment Agreement for material breach in the event notice of such breach is given in writing and the party in breach fails to cure within fifteen (15) days. Either Party may also terminate this Fulfillment Agreement immediately if the other Party is or is declared insolvent, has a trustee or liquidator appointed, or in placed in bankruptcy. In the event of such insolvency or other financial default by ESC, Insomniac shall have the right, upon twenty-four (24) hours notice to enter the warehouse of ESC to remove the Insomniac Merchandise inventory. Notwithstanding termination or expiration of the Term of this Fulfillment Agreement, Sections 7, 8, 9, 10, 13, 16, 17, 18, 19, 20, 23 and 24 shall survive such expiration or earlier termination.

21.      **No guarantee of success.** ESC does not guarantee any success or predictable outcome from the use of the Fulfillment Service.

22.      **Privacy Policy**. It is ESC's standard policy to never sell purchasers' information or the Fulfillment Service's content providers' information to third parties. ESC shall make available to Insomniac information about the purchasers of Insomniac Merchandise, provided such information may only be used by Insomniac for its own internal marketing purposes and analysis. Without limitation, Insomniac may not (a) sell or provide the information to a third party; (b) use the information for purposes of sending emails regarding services or products not related to Insomniac Merchandise; or (c) automatically subscribe customers to a mass mailing except that Insomniac may send an initial email allowing the customer to opt-in to such a subscription.

23.      **Governing Law**: Any claim or dispute arising out of or in connection with this Agreement shall be governed by laws of the State of California applicable to agreements deemed entered into and wholly performed therein. Each party grants to the state and federal courts located in Los Angeles, California, exclusive jurisdiction to hear any claim or dispute arising out of this Fulfillment Agreement.

24.      **Miscellaneous.** ESC shall have the right to sublicense the rights granted to ESC herein to any ESC affiliates or to any third party designated or engaged by ESC and acting on ESC's behalf for purposes of fulfilling ESC's obligations under this Agreement; provided, however, that ESC notifies Insomniac of such sublicense in advance of its undertaking, the affiliate or third party is capable of performing the tasks assigned to it to Insomniac's satisfaction, and ESC will remain jointly and severally liable for compliance with all of its obligations under this Fulfillment Agreement. Insomniac shall not have the right to assign any of its rights or obligations under this Fulfillment Agreement other than to a financially responsible party acquiring all or a majority of Insomniac's assets and assuming all of its obligations and liabilities in writing. Neither Party to this Agreement shall be deemed an agent, partner, joint venturer, or related entity of the other by reason of this Fulfillment Agreement. The failure of either Party to enforce any provision of this Fulfillment Agreement will not constitute a waiver of the Party's right to subsequently enforce that provision. Any waivers granted hereunder are effective only if recorded in writing and signed by the Party granting such waiver. If any provision of this Fulfillment Agreement is determined by any court or governmental authority to be unenforceable, the remainder of this Fulfillment Agreement shall continue in full force and effect, and the unenforceable provision shall be replaced by a provision that most closely meets the commercial intent of the Parties. This Agreement constitutes the entire agreement of the parties relating to the subject matter of this Agreement. This Fulfillment Agreement may be signed by the Parties in one or counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same  instrument.

6

Signatures hereof submitted via facsimile transmission or other electronic means shall be deemed an original signature, valid and binding to all intents and purposes.

**IN WITNESS WHEREOF**, the parties have duly executed this Fulfillment Agreement on the date first set forth above.

**ESC-Toy, Ltd**

By:_____

Name:    Erick Scarecrow

Title:

       PRESIDENT

**Insomniac Games, Inc.**

By: _____

Name:    Ted Price

Title:

       CEO

7

SCHEDULE 1

**Commission for selling Insomniac Merchandise:** ESC shall receive a fifty percent (50%) commission ("Commission") based upon the Net Profits, as next defined, received by Insomniac from the sale to consumers of each item of Insomniac Merchandise sold through the ESC Fulfillment Service during the Term. For purposes of this Fulfillment Agreement, "**Net Profits**" means all remittances received by Insomniac from ESC from such sale of Insomniac Merchandise, minus Insomniac's costs for the following: (i) cost to design, manufacture and produce the Insomniac Merchandise, including cost of prototype development, quality testing and certifications as provided in the Product Agreement; (ii) any third-party licensing fee; (iii) cost of shipment, including postage, packaging and handling; (iv) returns and allowances; (v) taxes for which Insomniac is responsible other than Insomniac corporate income taxes; and (vi) any credit card, PayPal or comparable customer payment processing fees directly incurred by Insomniac in fulfilling each order.

**Cost of Shipment**. Insomniac acknowledges that ESC may advance the direct cost of shipment incurred by ESC and that such advance will be the first deduction made by ESC in the calculation of Net Profits. ESC shall consult with Insomniac prior to incurring any unusual shipping costs related to odd-shaped, oversized or extra weight items.

**Warehousing.** There will be no monthly warehousing fee for any inventory of Insomniac Merchandise held at ESC primary warehouse location in Los Vegas, however, if ESC needs any additional temporary storage facilities to store Insomniac Merchandise, ESC will advise Insomniac promptly of the additional fees to be incurred and will bill Insomniac a monthly fee to cover such costs.

**ESC-Toy, Ltd**

By:_____
Name:    Erick Scarecrow

Title:
        PRESIDENT

Date: _____5/2/2018_____

**Insomniac Games, Inc.**

By: _____
Name:    Ted Price

Title:
        CEO

Date: _____5/2/2018_____

8